**UNITED STATES of America,
Appellee,**

v.

**Richard MARI, Defendant-Appellant.**

**No. 318, Docket 75–2048.**

United States Court of Appeals, Second Circuit.

Argued Oct. 29, 1975.

Decided Nov. 25, 1975.

Richard R. Romero, Dept. of Justice, Washington, D.C. (David G. Trager, U.S. Atty., E. D. N. Y., and Peter M. Shannon, Jr., Dept. of Justice, Washington, D.C., of counsel), for appellee.

Patrick F. Broderick, Bayside, N.Y., for defendant-appellant.

Before MULLIGAN, OAKES and MESKILL, Circuit Judges.

MULLIGAN, Circuit Judge:

On August 22, 1973 a seven-count indictment was filed in the Eastern District of New York charging appellant Richard Mari and his co-defendant William James MacQueen with extortionate extension of credit. Count I charged

both defendants with a conspiracy to use extortionate means to collect and attempt to collect an extension of credit to one Joseph Freno, Jr., in violation of 18 U.S.C. § 894; Count II charged Mari alone with an extortionate extension of credit to Freno, in violation of 18 U.S.C. § 892; Count III charged both defendants with threatening Freno in order to collect from him; Counts IV and VI charged Mari alone with threatening Freno on two separate occasions; Count V alleged that both defendants used violence and other criminal means to cause harm to Freno; and Count VII accused MacQueen alone of threatening Freno. It further appears from the indictment that Mari made the initial loan to Freno, but then advised Freno that MacQueen had "purchased" the debt from Mari, so that Freno had to repay MacQueen, at an extortionate rate.

At all times throughout the proceedings both defendants were represented by the same attorney, Kenneth Salaway, Esq. On January 18, 1974, both defendants appeared before Hon. John R. Bartels, United States District Judge, to request withdrawal of their not-guilty pleas and entry of guilty pleas. At that time the court pointed out the possibility of a conflict of interest because of the joint representation, and asked both defendants and attorney Salaway if they understood the possibility of a problem. All three replied in the affirmative. Salaway then represented that there was in fact no conflict between his clients.

On January 25, 1974, both defendants appeared again before Judge Bartels to enter their pleas. Specifically, Mari pleaded guilty to Count II of the indictment, which charged him alone with an extortionate extension of credit to Freno. An examination of the transcript of that hearing makes it clear that, in response to questions from the court, Mari claimed that he understood the nature of the charge against him, his right to proceed to trial if he wished, and the consequences of his guilty plea. In short, there was a meticulous examination of Mari by the court to determine the voluntariness of his plea as well as the factual basis therefor.

At the same hearing defendant MacQueen also pleaded guilty, to a two-count superseding information. MacQueen's comments indicate that he was trying to exculpate Mari by taking all the blame on himself. He concluded by saying:

I made all the threats. He just introduced me to Freno.

The Court: But Mr. Mari just told me he was guilty of the threats.

Defendant MacQueen: Well, through me. I told him what to say. I said "Just tell Mr. Freno or his son"—

The Court: Both or either of you threatened to use violence against Freno?

Defendant MacQueen: Me.

The Court: How about him?

Defendant MacQueen: No—well, I told him to say it but he never did it himself.

On April 5, 1974 Judge Bartels sentenced Mari to four months of imprisonment and two years eight months of probation; the period of incarceration has been served. All remaining counts against Mari were dropped. MacQueen on his guilty plea was given eighteen months' probation.

In November 1974, after his period of imprisonment, Mari instituted the instant action to vacate his conviction, pursuant to 28 U.S.C. § 2255, on the ground that his guilty plea was involuntary and that he was denied effective assistance of counsel, because it was improper for both defendants to have been represented by the same attorney. Judge Bartels held a hearing, at which Mari testified that attorney Salaway had never discussed a possible conflict of interest with him, and that in fact he was innocent of the charge to which he pleaded guilty and had not understood his plea. Salaway testified that, while he could not recall the specific conversation with Mari, he was sure that the topic of a potential conflict of interest had arisen.

After the hearing Judge Bartels denied the motion, leading to the instant appeal.

■ From our examination of the plea hearings there seems to be no question of the voluntariness of Mari's plea, which means that there may well have been a waiver by him of the issue of joint representation.[1] However, in any event that issue is without merit. It is settled in this Circuit that "some specific instance of prejudice, some real conflict of interest, resulting from a joint representation must be shown to exist before it can be said that an appellant has been denied the effective assistance of counsel." *United States v. Lovano,* 420 F.2d 769, 773 (2d Cir.), cert. denied, 397 U.S. 1071, 90 S.Ct. 1515, 25 L.Ed.2d 694 (1970) (citations omitted).[2] Here there is no showing of such prejudice. There appears to be no real conflict between Mari and his co-defendant MacQueen. Both, of course, pleaded guilty. It is true that, at the hearing on the guilty plea, Mac-Queen attempted to take the brunt of the guilt on himself and to exculpate Mari, but the latter himself still pleaded guilty voluntarily and after being fully informed of the consequences.

It is difficult to see how Salaway had any conflict of interest problem in recommending that Mari plead guilty. The record indicates that he thought that both of his clients would be convicted on trial. There was no reason for Salaway to sacrifice Mari by letting him plead guilty just because MacQueen was willing and obviously anxious to do so. Had both gone on trial and had MacQueen continued to take this position there might have been prejudice *to him* arising from Salaway's joint representation of both, see *United States v. DeBerry,* 487 F.2d 448, 453 (2d Cir. 1973). In any event *DeBerry* only requires that the trial judge conduct a careful inquiry, including a personal interrogation of the defendants, to satisfy himself that no conflict exists and that the parties had no valid objection to joint representation. That inquiry was made here. Judge Bartels's personal interrogation was thorough and complete. He had the opportunity on two occasions to observe the demeanor and gauge the credibility of Mari as well as MacQueen. While Mari now tries to vacate his plea on the ground that it was involuntary and that in fact he always expected to go to trial, we cannot disregard Judge Bartels's refusal to credit Mari's credibility.

Affirmed.

OAKES, Circuit Judge (concurring):

It is true that the cases in our circuit have to date required a specific showing of prejudice or a real conflict of interest resulting from joint representation of co-defendants by one attorney before Sixth Amendment rights may be said to have been invaded. *United States v. Lovano,* 420 F.2d 769, 773 (2d Cir.), *cert. denied,* 397 U.S. 1071, 90 S.Ct. 1515, 25 L.Ed.2d 694 (1970); *see United States v. DeBerry,* 487 F.2d 448, 453 (2d Cir. 1973). Under this test, which as the law of the circuit each judge is bound to follow, I am required to concur here, for the reasons well stated in Judge Mulligan's opinion. *See also Dukes v. Warden,* 406 U.S. 250, 256, 92 S.Ct. 1551, 32 L.Ed.2d 45 (1972).

The time is rapidly approaching, however, when, in the light of more exacting standards of the Bar and the decisions of other leading courts, we may have to reexamine our rule. The American Bar Association now takes the view, albeit

---

1. See *Edwards v. United States,* 103 U.S.App. D.C. 152, 256 F.2d 707, 709–10, cert. denied, 358 U.S. 847, 79 S.Ct. 74, 3 L.Ed.2d 82 (1958); *St. Clair v. Cox,* 312 F.Supp. 168, 170 (W.D. Va.1970). See generally Bishop, Waivers in Pleas of Guilty, 60 F.R.D. 513, 526–27 and cases cited (1974) (as a general principle, a guilty plea surrenders all defenses and all non-jurisdictional defects).

2. This rule has been consistently followed by this court. E.g., *United States v. Vowteras,* 500 F.2d 1210, 1211 (2d Cir.), cert. denied, 419 U.S. 1069, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974); *United States v. Wisniewski,* 478 F.2d 274, 281 (2d Cir. 1973); *United States v. Alberti,* 470 F.2d 878, 881 (2d Cir. 1972), cert. denied, 411 U.S. 919, 93 S.Ct. 1557, 36 L.Ed.2d 311 (1973).

with not altogether crystalline clarity, that

> Except for preliminary matters such as initial hearings or applications for bail, a lawyer or lawyers who are associated in practice should not undertake to defend more than one defendant in the same criminal case if the duty to one of the defendants may conflict with the duty to another. The potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to act for more than one of several co-defendants except in unusual situations when, after careful investigation, it is clear that no conflict is likely to develop and when the several defendants give an informed consent to such multiple representation.

ABA Standards Relating to the Prosecution Function and the Defense Function § 3.5 (Approved Draft 1971) at 211, 213. *See also* P. Wilson, Pattern Rules of Court and Code Provisions (prepared for the Committee on Implementation of Standards for the Administration of Criminal Justice of the Section of Criminal Justice of the ABA, 1975) at 38–39.

The District of Columbia Circuit has a rule of automatic appointment of separate counsel initially under the Criminal Justice Act, 18 U.S.C. § 3006A. *See Ford v. United States,* 126 U.S.App.D.C. 346, 379 F.2d 123, 126 (1967); *Lollar v. United States,* 126 U.S.App.D.C. 200, 376 F.2d 243 (1967). The First Circuit as an exercise of its supervisory power requires the trial court to comment on the risks inherent in dual representation, and to inquire as to each defendant's discussion of the risks with counsel, and understanding that he has a right to retain separate counsel and if qualified at Government expense. If the trial court neglects this inquiry, the Government must prove that prejudice to the defendant was "improbable." *United States v. Foster,* 469 F.2d 1, 4–5 (1st Cir. 1972). The Third Circuit requires no specific showing of prejudice as we do but rather holds that "upon a showing of a possible conflict of interest or prejudice, however

remote, we will regard joint representation as constitutionally defective." *United States ex rel. Hart v. Davenport,* 478 F.2d 203, 210 (3d Cir. 1973). *See generally Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Dukes v. Warden, supra.*

The problem is that even where as here both codefendants pleaded guilty there are frequently potential conflicts of interest. As the ABA Standards, *supra,* at 213, point out, the prosecutor may be inclined to accept a guilty plea from one codefendant which may harm the interests of the other. The contrast in the dispositions of the cases may have a harmful impact on the codefendant who does not initially plead guilty; he may be pressured into pleading guilty himself rather than face his codefendant's bargained-for testimony at a trial. And it will be his own counsel's recommendation to the initially pleading co-defendant which will have contributed to this harmful impact upon him. While there appears in this case no advantage to permitting Mari to plead guilty just because MacQueen was willing and anxious to do so, *Dukes v. Warden, supra,* in a given instance it would be at least conceivable that the prosecutor would be willing to accept pleas to lesser offenses from two defendants in preference to a plea of guilty by one defendant to a greater offense. As the ABA Standards, *supra,* at 213, also point out, the very fact of multiple representation makes it impossible to assure an accused that his statements to the lawyer are given in full confidence.

I do not suggest that I would propose any rule that dual representation is per se constitutionally defective, much less that a majority of the active members of this court, or the High Court on the Potomac, would agree to such a rule. I would propose, however, that given steadily increasing numbers of competent lawyers available, the availability of CJA funds for counsel for the indigent and the probabilities of conflict of interest inherent in dual representation, it should be only after the most searching

inquiry in the part of the court and in those exceptional circumstances where a conflict is not within the realms of reasonable foreseeability that dual representation by defense counsel should be permitted. The District of Vermont has had such an unwritten rule in effect for many years. Such a rule prevents both an occasional injustice and, equally important, the appearance of injustice.

I should make it clear that in my view it is immaterial whether we are talking about trying a case or handling a plea of guilty; the ABA Standards make no differentiation and unequivocally permit dual representation only in "preliminary matters such as initial hearings or applications for bail. . . ." It also makes no difference whether counsel is appointed by the court or selected by the defendants; even where selected by the defendants the same dangers of potential conflict exist, and it is also possible that the rights of the public to the proper administration of justice may be affected adversely. *Cf. United States v. Liddy,* 348 F.Supp. 198 (D.D.C.1972) (four Watergate defendants submitted affidavit opposing Government's motion to require separate counsel).

Trial court insistence that, except in extraordinary circumstances, codefendants retain separate counsel will in the long run in my opinion prove salutary not only to the administration of justice and the appearance of justice but the cost of justice; habeas corpus petitions, petitions for new trials, appeals and occasionally retrials, *see, e. g., United States v. Olsen,* 453 F.2d 612 (2d Cir.), cert. denied, 406 U.S. 927, 92 S.Ct. 1801, 32 L.Ed.2d 128 (1972), can be avoided. Issues as to whether there is an actual conflict of interest, whether the conflict has resulted in prejudice, whether there has been a waiver, whether the waiver is intelligent and knowledgeable, for example, can all be avoided. Where a conflict that first did not appear subsequently arises in or before trial, *e. g., United States v. DeBerry, supra; Austin v. Erickson,* 477 F.2d 620 (8th Cir. 1973); *Holland v. Henderson,* 460 F.2d 978 (5th Cir.

1972), continuances or mistrials can be saved. Essentially by the time a case such as the present one gets to the appellate level the harm to the appearance of justice has already been done, whether or not reversal occurs; at the trial level it is a matter which is so easy to avoid. As I have said in another context, not without irony intended, *Morgan v. Montanye,* 521 F.2d 693, 694 (2d Cir. 1975) (dissent from denial of rehearing en banc), the right to counsel is a "rather fundamental" one. *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). Only after the greatest scrutiny and in exceptional circumstances should dual representation, which may so frequently impair this right, be sanctioned by a federal district court.